**EXHIBIT 1**



# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Diane West<br>Arthur J. Gallagher & Co.<br>2850 Golf Rd<br>Fl 8<br>Rolling Meadows, IL 60008-4050 |
| **Electronic copy provided to:** | Marnie Navarro<br>Andrew Sullivan |

| | |
|---|---|
| **Entity:** | Arthur J. Gallagher & Co. (Illinois)<br>Entity ID Number  0504268 |
| **Entity Served:** | Arthur J. Gallagher & Co. |
| **Title of Action:** | Timothy J. Donohue vs. Arthur J. Gallagher & Co. |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Labor / Employment |
| **Court/Agency:** | Lincoln County Circuit Court, SD |
| **Case/Reference No:** | 41CIV22- |
| **Jurisdiction Served:** | South Dakota |
| **Date Served on CSC:** | 03/04/2022 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Cadwell Sanford Deibert & Garry LLP<br>605-336-0828 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

STATE OF SOUTH DAKOTA )       IN CIRCUIT COURT
                           : SS
COUNTY OF LINCOLN )       SECOND JUDICIAL CIRCUIT

| | | |
|---|---|---|
| TIMOTHY J. DONOHUE, | ) | 41CIV22- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | S U M M O N S |
| ARTHUR J. GALLAGHER & CO., a | ) | |
| Delaware corporation; and BOB | ) | |
| JACOBSEN, | ) | |
| | ) | |
| Defendants. | ) | |

THE STATE OF SOUTH DAKOTA TO THE ABOVE-NAMED
DEFENDANTS:

You are hereby summoned and required to answer the Complaint of the Plaintiff in the above-entitled action, which is herewith served upon you and will be filed in the office of the Clerk of the above entitled Court in the City of Canton, County of Lincoln, State of South Dakota, and to serve a copy of your Answer to the said Complaint on the subscribers at their office, whose address is 200 E. 10th Street, Suite 200, Sioux Falls, South Dakota 57104, within thirty (30) days after the service of this Summons upon you, exclusive of the day of service; and in case of your failure to answer the said Complaint within that time, judgment by default may be rendered against you as requested in the Complaint.

Dated:  February 28, 2022

                              CADWELL SANFORD DEIBERT
                              & GARRY LLP

          By  _/s/ *SW Sanford*_

                              Steven W. Sanford
                              200 E. 10th Street, Suite 200
                              Sioux Falls, South Dakota 57104
                              (605) 336-0828
                              E-mail: *ssanford@cadlaw.com*
                              ***Attorneys for Plaintiff***

STATE OF SOUTH DAKOTA )          IN CIRCUIT COURT
                        : SS
COUNTY OF LINCOLN )          SECOND JUDICIAL CIRCUIT

TIMOTHY J. DONOHUE,            )          41CIV22-
                              )
      Plaintiff,           )
                              )
v.                            )
                              )          S U M M O N S
ARTHUR J. GALLAGHER & CO., a  )
Delaware corporation; and BOB )
JACOBSEN,                     )
                              )
      Defendants.          )

THE STATE OF SOUTH DAKOTA TO THE ABOVE-NAMED
DEFENDANTS:

     You are hereby summoned and required to answer the Complaint of the Plaintiff
in the above-entitled action, which is herewith served upon you and will be filed in the
office of the Clerk of the above entitled Court in the City of Canton, County of Lincoln,
State of South Dakota, and to serve a copy of your Answer to the said Complaint on the
subscribers at their office, whose address is 200 E. 10th Street, Suite 200, Sioux Falls,
South Dakota 57104, within thirty (30) days after the service of this Summons upon you,
exclusive of the day of service; and in case of your failure to answer the said Complaint
within that time, judgment by default may be rendered against you as requested in the
Complaint.

     Dated:  February 28, 2022

                              CADWELL SANFORD DEIBERT
                              & GARRY LLP

                By  _/s/ SW Sanford_____

                    Steven W. Sanford
                    200 E. 10th Street, Suite 200
                    Sioux Falls, South Dakota 57104
                    (605) 336-0828
                    E-mail: *ssanford@cadlaw.com*
                    ***Attorneys for Plaintiff***

STATE OF SOUTH DAKOTA    )                    IN CIRCUIT COURT
                         : SS
COUNTY   OF   LINCOLN    )                    SECOND JUDICIAL CIRCUIT

TIMOTHY J. DONOHUE,                )          41CIV22-
                                   )
          Plaintiff,               )
                                   )
v.                                 )
                                   )          C O M P L A I N T
ARTHUR J. GALLAGHER & CO., a       )
Delaware corporation; and BOB      )
JACOBSEN,                          )
                                   )
          Defendants.              )

For his Complaint against Defendants, Plaintiff states and alleges as follows:

## Facts Common to All Causes of Action

1.      At all times material to this action, Plaintiff ("Tim") has been a resident of

Minnehaha County, South Dakota.

2.      Defendant Arthur J. Gallagher & Co. ("Gallagher") is engaged in the

insurance and benefits brokerage business, is a Delaware corporation, has its principal

office in Rollings Meadows, Illinois, and has maintained a Sioux Falls office in Lincoln

County.

3.      Defendant Bob Jacobsen ("Jacobsen") is an Area President for Gallagher

and resides in Des Moines, Iowa.

4.      For decades prior to 2018, Tim was an insurance agent with Williams

Insurance Agency, Inc.; and after Gallagher's acquisition of Williams, Tim became an

employee of Gallagher pursuant to an Employment Agreement, a true copy of which is attached hereto as Exhibit A.

5.      On January 25, 2022, Tim appeared before the South Dakota Legislature Senate Commerce and Energy Committee and gave testimony concerning Senate Bill 92, then under consideration by such Committee.

6.      Such appearance and testimony was requested of him by legislators and also by a personal friend of Tim's.

7.      A copy of SB 92 is attached hereto as Exhibit B.

8.      As Tim understood SB 92, the Bill would, for the benefit of pool members, provide greater transparency and accountability by insurance pools that provide worker's compensation coverage under SDCL 1-24, specifying reporting responsibilities to the Department of Legislative Audit and the Government Operations and Audit Committee of the House of Representatives.

9.      The ideas of transparency and accountability were consistent with the values that Gallagher espoused to its employees, including Tim.

10.     SB 92 was sponsored by 14 legislators, including two retired Circuit Court Judges.

11.     Tim's testimony primarily concerned the history of insurance pools, the reasons for their existence and their differences from private insurers.

12.     A representative of the Independent Insurance Agents of South Dakota also testified in favor of the Bill.

2

13.     As of the date of the Committee hearing and the date of this Complaint,

only two such pools offer worker's compensation coverage, one for electing members of

the South Dakota Municipal League and the other for electing members of the Associated

School Boards of South Dakota.  Neither of these pools were or are clients or customers

of Gallagher.

14.     In signing in for his appearance, as shown by attached Exhibit C, and in his

testimony, Tim made no disclosure of or reference to his relationship with Gallagher.

15.     In a prior conversation, Tim advised Jacobsen that he was thinking of

running for the Legislature; and Jacobsen encouraged him to do that.

16.     Tim's appearance before the Legislative Committee and his testimony are

protected by the First Amendment of the United States Constitution and the correlative

provision of the South Dakota Constitution.

17.     On February 2, 2022 at approximately 3:00 p.m., Tim received a call from

Jacobsen that had been deceptively scheduled for a different purpose.  In the course of the

conversation, Jacobsen notified Tim that his employment was being terminated because

of his appearance and testimony before the Legislative Committee.

18.     Promptly following Tim's termination in that phone conversation,

Gallagher contacted Tim's clients advising them of Tim's termination under

circumstances falsely imputing supposed misconduct.

**First Cause of Action**

19.     Plaintiff realleges ¶¶ 1-18 above to the same extent as though fully set forth

herein.

3

20.    Tim's employment termination by Gallagher as above-described violates, is contrary to and offends South Dakota public policy.

21.    Such termination constitutes retaliatory discharge that is a tort under South Dakota law.

22.    As a proximate result of the foregoing, Tim has suffered damage and detriment in amounts not yet determinable, but at least $500,000.

23.    Such wrongful conduct was intentional, malicious and in reckless disregard of Tim's rights under the public policy of South Dakota and Tim is entitled to punitive damages in addition to compensatory damages.

## Second Cause of Action

24.    Plaintiff realleges ¶¶ 1-23 above to the same extent as though fully set forth herein.

25.    Tim's employment termination was without legally permissible cause.

26.    The restrictions in the Employment Agreement on Tim's post-termination employment or business activity are thereby unenforceable or, alternatively, unreasonable and overbroad.

27.    Tim is entitled to this Court's declaratory judgment determining such restrictions to be unenforceable or, alternatively, limiting them to a reasonable scope.

## Third Cause of Action

28.    Plaintiff realleges ¶¶ 1-27 above to the same extent as though fully set forth herein.

29.     Gallagher's attempt to enforce the post-termination employment or business restrictions in the Employment Agreement would cause irreparable harm to Tim not adequately remedied by an award of monetary damages.

30.     Tim is entitled to a temporary restraining order, preliminary injunction and permanent injunction restraining and enjoining Gallagher from enforcing such restrictions.

WHEREFORE, Tim prays for judgment against Defendants as follows:

1.      For compensatory damages in an amount to be determined by the trier of fact, but not less than $500,000, and for prejudgment interest thereon.

2.      For punitive damages in an amount to be determined by the trier of fact.

3.      For this Court's declaratory judgment declaring the above-described post-termination restrictions to be unenforceable or, alternatively, determining the reasonable scope of the same.

4.      For a temporary restraining order, preliminary injunction and permanent injunction enjoining and restraining Gallagher from enforcing such restrictions as set forth in the Employment Agreement.

5.      For such other and further relief as the Court deems appropriate in the circumstances.

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated:  February 28, 2022

CADWELL SANFORD DEIBERT
& GARRY LLP

By  _/s/ *SW Sanford*_____

Steven W. Sanford
200 E. 10th Street, Suite 200
Sioux Falls, South Dakota 57104
(605) 336-0828
E-mail: *ssanford@cadlaw.com*
**Attorneys for Plaintiff**

6

# EXHIBIT A

## Employment Agreement

HRC0312371                                                                **Execution Copy**

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (this "<u>Agreement</u>") is made and entered into as of the Effective Date (as defined below) by and between Timothy J. Donohue (hereinafter referred to as "<u>Employee</u>") and Arthur J. Gallagher & Co., a Delaware corporation with its principal place of business in Rolling Meadows, Illinois ("<u>AJG</u>") and its subsidiaries, divisions and affiliated and related companies (hereinafter referred to collectively as the "<u>Company</u>").

## RECITALS

WHEREAS, the Employee is a stockholder, officer, director and/or key employee of Williams Insurance Agency, Inc. (the "<u>Acquired Business</u>"), substantially all the goodwill and other assets of which are being acquired by the Company in a transaction being completed contemporaneously with this Agreement ("<u>Transaction</u>") pursuant to an Asset Purchase Agreement dated February 5, 2018 by and among AJG, Arthur J. Gallagher (U.S.) LLC ("<u>Subsidiary</u>"), the Acquired Business, and Employee (the "<u>Asset Purchase Agreement</u>");

WHEREAS, Employee is being hired to be a valued key employee who with the execution of this Agreement will be provided and will continue to be provided during his employment with valuable confidential and proprietary information of the Company and will have significant managerial, production and/or account servicing responsibilities for the Company; and

WHEREAS, the parties acknowledge that the Company has a legitimate interest in retaining the services of the Employee and the taking of the covenants herein in order to preserve the goodwill, customer relationships and value of the business to be handled by the Employee including the Acquired Business;

WHEREAS, the Employee is a signatory to the Asset Purchase Agreement, is directly or indirectly selling a material stake in the Acquired Business, and is substantially and personally benefiting from the Transaction; and

WHEREAS, the execution of this Agreement is a condition to the effectiveness of the aforesaid Transaction.

NOW, THEREFORE, in consideration of the above recitals, mutual covenants and agreements set forth below, and for other good and valuable consideration, including but not limited to, employment with the Company, the compensation and benefits described herein, receipt and the ability to utilize the Company's confidential and proprietary information, and being provided and/or allowed access to and contact with certain Company accounts, the sufficiency of which the parties hereby acknowledge, the parties agree as follows:

SECTION 1.      Employment and Term.

The parties agree that the Effective Date of this Agreement shall be February 5, 2018.   The Company agrees to employ Employee and Employee agrees to serve the Company and perform the duties set forth below for a term beginning on the Effective Date and ending on January 31, 2021 (the "Contract Term") unless earlier terminated by either party as provided in Section 5 below.  After the Contract Term, Employee's employment with the Company shall automatically continue as an at-will employment except that the parties agree that Employee's employment may not be terminated by either Employee or the Company without 21 days written notice by either party who wishes to terminate Employee's employment with the Company; except in case of Employee's termination for cause, which shall be governed by the provisions of Section 5 below.  The parties agree that even after the Contract Term, Employee's continued employment thereafter shall be subject to the terms and conditions of this Agreement, except for those contained in Section 3.

SECTION 2.      Duties.

A.   Employee shall be obligated and responsible for soliciting, handling business for, selling insurance and rendering services related to Insurance Services and Benefit Services (as hereinafter defined) on behalf of the Company and its subsidiaries.  Employee agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities.  Employee further agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities. Employee agrees to comply with all Company policies and procedures in effect and applicable to him. Employee shall not, either during or outside normal business hours, directly or indirectly, sell, solicit, service, or manage insurance business, or engage in any aspect of the insurance business for or on behalf of any person or entity other than the Company, nor engage in any activity inimical to the best interests of the Company.

As used in this Agreement, the following definitions shall apply:

"Insurance Services" shall mean transferring, placing, marketing, accepting, aiding, counseling or consulting in the placement, renewal, discontinuance or replacement of any insurance (including self-insurance) by, or handling self-insurance programs, insurance claims, risk management services or other insurance administrative or service functions.

"Benefit Services" shall mean providing employee benefit brokerage, consulting, or administration services, in the area of group insurance, defined benefit and defined contribution pension plans, individual life, disability and capital accumulation products; investment advisory services, wealth management, or group retirement services; defined benefit and defined contribution pension services; human resource consulting services, including without limitation, compensation consulting, compensation

program design, compensation and benefits surveys, and human resources management; and all other employee benefit or human resource areas in which the Company is involved.

      B.   Employee's title shall be Area Vice President, but it shall not be a breach of this Agreement if such title is changed or varied. Employee also shall undertake those duties that are assigned to him by his immediate manager.

      C.   Employee recognizes that, by virtue of the Transaction and his employment by the Company and to assist him in the solicitation, production, management, and/or servicing of accounts, he will be provided and granted otherwise prohibited access to certain confidential and proprietary data and information of the Company (including the Acquired Business) which is not known either to its competitors or within the insurance agency, consulting and brokerage business generally and which has independent economic value to the Company. This information (hereinafter referred to as "Confidential Information") includes, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; retirement plan consulting, variable annuities, and fund investment business and related products and services; business, management and human resources/personnel strategies; details of salary, bonus and other compensation arrangements, including those of Employee; the criteria and formulae used by the Company in pricing its insurance and benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages that the Company has negotiated with various underwriters; highly sensitive information about the Company's agreements and relationships with certain underwriters; sales data contained in various tools and resources (including, without limitation, Salesforce.com); lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts; the composition and organization of Company accounts' businesses; the peculiar risks inherent in the operations of Company accounts; highly sensitive details concerning the structure, conditions and extent of existing insurance coverages of Company accounts; policy expiration dates relating to Company accounts; premium amounts relating to Company accounts; commission rates relating to Company accounts; risk management service arrangements relating to Company accounts; loss histories relating to Company accounts; candidate and placement lists relating to Company accounts; and other data showing the particularized insurance or consulting requirements and preferences of Company accounts. Employee recognizes and agrees that part of his duties may include assisting in the development of information and data that is Confidential Information belonging to the Company. Confidential Information may be stored in files, documents, dailies, daily reports, renewal information, customer lists, accounting records, products purchased by customers, customer account and credit data, referral sources, computer programs and software, customer comments, Company written manuals and marketing and financial analysis, plans, research and programs. Employee recognizes that this Confidential Information constitutes valuable

property of the Company, developed over a long period of time and at substantial expense and that the Company takes reasonable efforts to keep this Confidential Information confidential and made available only to those employees who need access to such Confidential Information to perform their job functions for the Company. Employee agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

D.   The Company agrees that, during Employee's employment with the Company, it shall: (i) provide Employee with certain Confidential Information the Employee did not previously possess, including, but not limited to, Confidential Information about certain of the Company's accounts; (ii) provide Employee with information and access to the Company's proprietary insurance and risk management programs; (iii) provide Employee with access to the Company's specialized business operations relating to particular aspects of the insurance agency and risk management business; (iv) maintain specialized training programs to which Employee shall qualify and apply; and (v) provide such other assistance which may reasonably aid Employee in performing his sales, management and/or servicing duties.

E.   Employee acknowledges and understands that an essential element of the Company's business is the development and maintenance of personal contacts and relationships with its accounts, and that Employee will be provided and allowed access to certain of the Company's accounts for the purpose of establishing personal contact and relationships with such accounts for the benefit of the Company. Employee acknowledges and understands that the Company invests considerable time, money, and resources necessary to develop and maintain a relationship between its employees and a client, and in that regard, the Company will pay Employee's salary, reimburse reasonably necessary business expenses, provide Employee with certain Confidential Information, and provide the resources necessary to service the Company accounts managed or serviced by Employee by making available legal advice, accounting support, advertising and other corporate services. Moreover, although Employee acknowledges and understands that certain of the Company's accounts may develop an identification with Employee rather than the Company itself, all such accounts shall at all times be Company accounts for all purposes and Employee disclaims any interest in any such Company accounts.

SECTION 3.   Compensation and Benefits.

A.   Base Salary. In the first Employment Year, the Employee's base salary ("Base Salary") shall be a fixed annualized amount of $130,140, payable in semi-monthly installments. Beginning with the second Employment Year, the Base Salary after the first Employment Year shall be adjusted at the beginning of each Employment Year to an amount equal to 25% of the Employee's Book calculated pursuant to subsection 3.B below for the prior Employment Year (as defined below).

B.   Employee's Book.   "Employee's Book" shall mean the property and casualty revenues collected by the Company (or an affiliate thereof) from insurance written by the Company for customers which are new or renewal customers of the Company or any affiliate thereof who are within Employee's assigned customer block.   Employee's Book shall be calculated by the Company and shall be reconciled against the Base Salary subject to Section 3.A above following each Employment Year.   Except as may be otherwise specifically provided herein, compensation shall accrue only while Employee is employed by the Company, and shall cease in any event upon the expiration of the Contract Term.

Notwithstanding anything to the contrary set forth above, for the purposes of determining such compensation, each of the following conditions shall apply:

(1)   Employee's Book shall include only revenues received by the Company during the Contract Term and shall include only commissions and fees derived exclusively from the Employee's management of such customers who are within the Employee's assigned customer block;

(2)   Employee's Book will not include additional/supplemental commission or contingent commission;

(3)   Employee's Book shall be net of payments to third parties such as co-brokers or sub-brokers, referral bonuses, client paid expense and any other expenses paid on the clients' behalf or because of client relationship like donations;

(4)   As used in this section the term "Employment Year" shall mean each 12-month period beginning January 1, 2018 and each January 1 thereafter during which Employee is employed by the Company;

(5)   As used in this section, the term "affiliate" shall mean, with respect to any person, any person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with such person;

(6)   To the extent that an unusual timing of payment of premium by a client or other event would distort unfairly one or more Employment Years, the parties agree to equitably adjust revenues to one-year periods and allow for more meaningful measurement and comparison;

(7)   Referral fees paid to Employee pursuant to various programs of Company affiliates shall not be included in the calculation of compensation in subsections A. and B. and will be paid under the current referral plans in effect during the Employment Year; and

(8)   Employee acknowledges and agrees that his book of business will be transitioned over time so that he will become exclusively a property and casualty broker.

C.   Employee Benefits.   While employed by the Company, Employee shall enjoy the customary benefits afforded to similarly situated employees of the Company.   Employee shall be entitled to participate in employee benefit plans now or hereafter provided or made available to the Company's

employees generally, such as group hospitalization and medical, life and disability insurance.  Nothing in this Agreement shall require the Company to establish, maintain, or continue any of the employee benefits already in existence for employees of the Company and nothing in this Agreement shall restrict the right of the Company to amend, modify or terminate such employee benefit programs.

      D.    <u>Vacations.</u>  Employee shall be entitled each year to vacation benefits in accordance with the policies of the Company.  The Company shall not pay Employee any additional compensation for any vacation time not used by Employee.  Employee will be provided reasonable opportunity to use accrued vacation time, upon prior written request and subject to the business needs of the Company.  Unused vacation time may be carried over to a subsequent year only in accordance with the policies of the Company.

      E.    <u>Expenses.</u>  Employee shall be entitled to reimbursement of reasonably incurred business expenses in accordance with, and subject to the limitations of, the Company's policies and practices then in effect.

      F.    <u>Training.</u>  The Company shall provide Employee with the customary internal training that is normally offered similarly situated employees of the Company.

      <u>SECTION 4.</u>     <u>Representations.</u>

      Employee represents and warrants to the Company that, except as he may be so bound by the Acquired Business:

      A.    He is not, and will not become a party to any agreement, contract, arrangement or understanding, whether of employment or otherwise, that would in any way restrict or prohibit him from undertaking or performing his duties in accordance with this Agreement or that restricts his ability to be employed by the Company in accordance with this Agreement;

      B.    His employment by the Company will not violate the terms of any policy of any prior employer of Employee regarding competition;

      C.    His position with the Company, as described in this Agreement, will not require him to improperly use any trade secrets or confidential or proprietary information of any prior employer, or any other person or entity for whom he has performed services;

      D.    He has not misused, and will not misuse, any confidential or proprietary information he has obtained from any prior employer or any other person or entity;

      E.    He has not copied, saved, downloaded, or otherwise retained in any form whatsoever any confidential or proprietary information of any prior employer or any other person or entity; and

      F.    He is in compliance with any non-competition and/or non-solicitation agreements, or other restrictive covenant obligations in place between him and any former employer and will continue to be in

compliance, regardless of whether he believes such agreements and/or restrictive covenants are enforceable or not.

SECTION 5.     Termination of Employment Relationship.

A.   Either party shall have the right to terminate Employee's employment with the Company at any time upon 21 days written notice to the other party.

B.   The Company shall have the right to terminate the employment of Employee at any time, with no liability on the part of the Company under this Agreement or otherwise, upon the happening of any of the following:

(1)  The death of Employee;

(2)  Employee commences to receive disability benefits pursuant to the disability plan applicable to employees of the Company and upon notice to Employee;

(3)  Employee's employment has been terminated for Cause.  As used herein, the term "Cause" shall mean a termination of employment based upon the good faith determination of the Company that one or more of the following events has occurred:

a)   Material breach of this Agreement by Employee after having been given written notice of such breach and a reasonable opportunity to cure such breach, which notice shall be at least 10 days but no more than 30 days depending upon the particular facts and circumstances involved in the material breach;

b)   Employee has committed a dishonest act to the material detriment of the Company or any act of fraud against the Company;

c)   Employee has been convicted (including a plea of guilty or no contest) of a crime involving moral turpitude or for any felony;

d)   Employee's unlawful use (including being under the influence of) or possession of illegal drugs;

e)   Material and persistent insubordination on the part of Employee;

f)   The loss, for any reason, by Employee of any license or professional registration necessary to the performance of Employee's duties, which loss continues without reinstatement for a period in excess of 30 days without the Company's written consent;

g)   The diversion of any business or business opportunity of the Company for the benefit of any party other than the Company;

h)   Material violation of the Company's policies and procedures including, without limitation, finance policies, human resource policies and the Global Standards of Business Conduct by Employee;

    i) Continuing failure of Employee to perform his duties (other than as a result of disability), which duties Employee has been directed in writing to perform by Employee's immediate manager; or

    j) Conduct on the part of Employee inconsistent with the covenants set forth in Section 8 below.

  C. It is understood and agreed that upon termination of Employee's employment with the Company when such termination is for Cause as provided above, Employee's entitlement to further compensation and benefits shall cease immediately.

  D. In the case of termination of Employee's employment with the Company where 21 days' notice of such termination is required to be given by either party under this Agreement (such 21-day notice period hereinafter referred to as the "Notice Period"), the Company agrees to continue in effect during the Notice Period the compensation and benefits to which Employee may be entitled under Section 3 of this Agreement.  It is understood and agreed that at the expiration of the Notice Period, Employee's entitlement to such compensation and benefits shall cease except that in the event the Company terminates Employee's employment for reasons other than as set forth in Section 5.B above, or for no reason, the Company shall continue to be obligated to pay to Employee an amount equal to all compensation and benefits set forth in Section 3 herein, payable as and when payable to employees of the Company generally, until the end of the Contract Term stated in Section 1 herein; provided, however: (i) the payment of all such compensation and benefits shall cease if Employee does not execute and deliver a general release in a form acceptable to the Company ("Release") within 30 days following delivery by the Company of the Release and the Release becomes effective and cannot be revoked; (ii) the Company's obligation to continue making payments of compensation and benefits shall cease in the event Employee is in breach of this Agreement; and (iii) the payment of all such compensation and benefits until the end of the Contract Term shall be in lieu of and not in addition to any severance benefit that might otherwise be payable to the Employee under the terms of any severance plan or program of the Company applicable to employees of the Company.

  E. Employee agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and the orderly transfer to other Company employees of the accounts for which he has been most recently responsible.  Employee further agrees that, during the Notice Period (whether or not active employment responsibilities continue during the Notice Period), Employee's duties to the Company, including Employee's fiduciary duty, shall remain in effect.  Employee agrees that, prior to the expiration of the Notice Period, he will return to the Company all originals and hard copies of literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the

Company, including specifically all materials which comprise or refer to the Company's Confidential Information. It is understood and agreed that Employee will not retain any copy, facsimile or note intended to memorialize any such data. Employee further understands and agrees that, during or at the expiration of the Notice Period, and as part of his assigned job duties, he will reasonably participate in any meeting the Company may convene to: (i) review the status of accounts for which Employee has been most recently responsible or associated; (ii) ensure that Employee has fully obtained his entitlements under this Agreement and as provided by law; and/or (iii) confirm that Employee clearly understands the nature and scope of his post-employment obligations.

F.   As of the effective date of termination of Employee's employment for any reason, Employee agrees that the Secretary of the Company may, as an irrevocable proxy and in Employee's name and stead, execute all documents and things which the Company deems necessary and desirable to effect Employee's resignation as an officer or director of any company (if applicable) included within the definition of the Company as used in this Agreement.

G.   Employee agrees that, prior to the commencement of any new employment in any business providing Insurance Services or Benefit Services, Employee will furnish his prospective new employer with a copy of this Agreement. Employee also agrees that the Company may advise any prospective new employer of Employee of the existence and terms of this Agreement and furnish the prospective new employer with a copy of this Agreement.

H.   During the period of his employment with the Company, and after employment termination, Employee agrees to voluntarily make himself available to the Company and its legal counsel, at the Company's request without the necessity of obtaining a subpoena or court order, in connection with the Company's investigation, preparation, prosecution and/or defense of any actual or potential legal proceeding, regulatory action, or internal matter. Employee agrees to provide any information reasonably within his recollection. The Company will reimburse Employee for reasonable out-of-pocket expenses actually incurred as a result of such requests, or, at the Company's option, will arrange to advance Employee's reasonable expenses or incur such expenses directly.

I.   Employee agrees, that, while he is employed by the Company, and after the date of termination of his employment, he shall not make any false, defamatory or disparaging statements about the Company or the officers or directors of the Company that are reasonably likely to cause material damage to the Company or the officers or directors of the Company.

SECTION 6.   The Company's Right to Injunctive Relief; Attorneys' Fees.

Employee acknowledges that Employee's services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law should he breach or threaten to breach his post-employment

obligations under this Agreement.  Employee also acknowledges that it would be too difficult to measure precisely the damages to the Company from any breach by Employee of Sections 7 and/or 8 of this Agreement, that injury to the Company from any such breach would be incalculable and irremediable, and that money damages would therefore be an inadequate remedy for any such breach.  Accordingly, in addition to any other remedy which the Company may have at law or in equity, the Company shall be entitled to enforce this Agreement and shall be entitled to a temporary restraining order and preliminary and permanent injunctive relief to restrain any such breach or further breach by Employee.  Employee expressly waives the right to contest whether a breach of Section 7 or 8 of this Agreement would result in irreparable harm to the Company.  In addition, Employee agrees that the Company will have the right to seek injunctive relief when and if it elects to do so and any delay in seeking injunctive relief will not prejudice or waive the Company's right to do so.  Employee expressly waives the right to assert that the Company is not entitled to injunctive relief because of any delay in seeking such relief.  Employee agrees that he shall be responsible for and pay the Company its reasonable attorneys' fees and other expenses and costs incurred to enforce this Agreement if the Company is the prevailing party.  Employee further agrees that if Employee breaches any covenant contained in Sections 7 and/or 8 of this Agreement, the Company shall be entitled, in addition to all other legal or equitable remedies it may have, to offset and withhold against any such loss, cost, liability or expense any and all amounts of any kind that may then be owing or payable by the Company to Employee pursuant to this Agreement or otherwise.

SECTION 7.        Trade Secrets and Confidential Information.

A.  Employee acknowledges that the Company's business depends to a significant degree upon the possession of information which is not generally known to others, and that the profitability of the Company's business requires that this information remain proprietary to the Company.  Accordingly:

(1)  Employee agrees that all intellectual property, such as computer programs, systems or software, developed during his employment or as a result of his employment is work for hire performed by Employee in the scope of his employment.  To the extent that any such intellectual property is determined not to constitute work for hire, or if any rights in any such intellectual property do not accrue to the Company as a work for hire, Employee's signature on this Agreement constitutes an assignment (without any further consideration) to the Company of any and all of his respective copyrights and other rights, title and interest in and to all such intellectual property.  The Company shall retain all proprietary rights to any and all such intellectual property.  Employee agrees to execute any documents necessary to perfect the Company's interest in such intellectual property upon the Company's request.

(2)  Employee has been notified by the Company, and understands, that the foregoing provisions of Section 7.A(1) do not apply to an item of intellectual property for which no equipment, supplies, facilities or Confidential Information of the Company was used and which was developed

entirely on Employee's own time, unless: (I) the item of intellectual property relates (A) to the business of the Company or (B) to the Company's actual or demonstrably anticipated research and development, or (II) the item of intellectual property results from any work performed by Employee for the Company.

B.   Employee recognizes the highly sensitive nature of the Confidential Information he will be given and to which he will have access during his employment with the Company, and acknowledges the Company's legitimate interest in safeguarding such from disclosure.  Accordingly, in addition to the restrictions provided in Section 8 below, Employee agrees that (i) after his employment with the Company is terminated, he will not divulge Confidential Information that constitutes a trade secret of the Company or make use of it for his own purpose or the purpose of another, and (ii) for a period of two years following the termination of his employment with the Company, he will not divulge Confidential Information that does not constitute a trade secret of the Company or make use of it for his own purpose or the purpose of another.  Employee and the Company agree and acknowledge that not all of the Confidential Information will rise to the level of a trade secret of the Company, but nonetheless, all Confidential Information shall be entitled to the protections and restrictions provided in this Agreement. Employee further acknowledges that, notwithstanding the generality of prohibitions regarding the misuse or disclosure of Confidential Information, nothing in this Agreement prohibits Employee from reporting possible violations of federal law or regulation to any governmental agency or entity including, without limitation, the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation.

C.   Employee understands and acknowledges that he will benefit significantly from having access to and being given Confidential Information and but for his agreements not to divulge such Confidential Information and the further restrictive covenants contained in Section 8 below, the Company would not agree to provide Employee with Confidential Information.  Further, Employee acknowledges that any breach by him of the restrictions provided in Section 8 below would inevitably and necessarily lead to the prohibited disclosure and/or use of Confidential Information.

SECTION 8.        Protection of the Company's Protectable Interests.

In order to protect the goodwill and other assets being acquired in the Transaction as well as the legitimate interests of the Company in, among other things, protecting its Confidential Information, relationships with Company accounts, and related existing goodwill, and in consideration for, among other things as provided in this Agreement, the Company's promise to give Employee certain Confidential Information which Employee did not previously have and to enforce Employee's promise not to disclose such Confidential Information, Employee hereby agrees to the following restrictive

covenants, which Employee acknowledges and agrees are reasonably necessary and narrowly tailored to protect the Company's legitimate business interests:

A.   (1)   For a period equal to the longer of:  (i) five years after the Closing Date (as defined in the Asset Purchase Agreement), or (ii) two years following the termination of the Employee's employment with the Company or any of its affiliates (as applicable) for any reason whatsoever, the Employee will not, directly or indirectly, compete in any way with the Acquired Business anywhere within a 25-mile radius of the location of any client, customer or Prospective Account of the Acquired Business.  For the purposes of this Section 8.A(1), the term "compete in any way with the Acquired Business" shall mean engaging in or attempting to engage in any business similar to that carried on by the Acquired Business or by the Company or any of its affiliates.

(2)   For a period equal to the longer of:  (i) five years after the Closing Date, or (ii) two years following the termination of the Employee's employment with the Company or any of its affiliates (as applicable) for any reason whatsoever, the Employee will not, directly or indirectly, engage in providing Insurance Services or Benefit Services for:  (x) any account of the Acquired Business or which was an account of the Acquired Business within two years prior to the Closing Date including, without limitation, the "Customers" as defined in the Asset Purchase Agreement (hereinafter referred to as a "Protected Seller Account") or (y) any Prospective Account (as defined below) of the Acquired Business.

(3)   For a period equal to the longer of:  (i) five years after the Closing Date, or (ii) two years following the termination of the Employee's employment with the Company or any of its affiliates (as applicable) for any reason whatsoever, the Employee will not, directly or indirectly, engage in providing Insurance Services or Benefit Services for:  (x) any account of the Company or any of its affiliates for which the Employee performed any of the foregoing functions during the two-year period immediately preceding such termination including, without limitation, the "Customers" as defined in the Asset Purchase Agreement (hereinafter referred to as a "Protected Company Account"); or (y) any Prospective Account of the Company or any of its affiliates, it being understood and agreed that this Section 8.A(3) does not restrict or limit Section 8.A(2) or any other provision of Section 8.

B.   For purposes of Section 8.A above, Employee agrees that direct or indirect solicitation of a Protected Seller Account, Protected Company Account or Prospective Account shall expressly include, but not be limited to, the following (which is not intended to be an exhaustive list of direct or indirect solicitation, but is meant to provide examples of certain reasonably anticipated scenarios):

(1)   The sending of an announcement by Employee or his new employer to any Protected Seller Account, Protected Company Account or Prospective Account, the purpose of which is to communicate to the recipient that Employee has either formed his own business enterprise or joined an

existing business enterprise that does or will perform Insurance Services and/or Benefit Services that in any way compete with the Company.

(2) Initiating a communication or contact by Employee or his new employer with any Protected Seller Account, Protected Company Account or Prospective Account for the purpose of notifying such Protected Seller Account, a Protected Company Account or Prospective Account that Employee has either formed his own business enterprise or joined an existing business enterprise that does or will perform Insurance Services and/or Benefit Services that in any way compete with the Company.

(3) Employee's or his new employer's communication with any Protected Seller Account, Protected Company Account or Prospective Account (if such new employer's communication with a Prospective Account was facilitated by Employee, directly or indirectly, or if Employee will or is intended to benefit, directly or indirectly, by such communication) if any such communication in any way relates to Insurance Services and/or Benefit Services; provided, however, nothing herein is intended to limit communications or contacts that are unrelated to Insurance Services and/or Benefit Services.

(4) The facilitation by Employee, directly or indirectly, of any Protected Seller Account's or a Protected Company Account's execution of a broker of record letter replacing the Company as its broker of record.

C. Employee understands and agrees that many of the accounts for which he will perform Insurance Services and/or Benefit Services while employed by the Company are national accounts and that Employee will perform Insurance Services and/or Benefit Services for Company accounts throughout the entire country. Employee agrees and acknowledges that the geographic scope relating to the restrictions provided in Section 8.A above shall include the entire United States and that since the post-employment restrictions herein provided are tied directly to Protected Seller Accounts and Protected Company Accounts for whom Employee performed Insurance Services and/or Benefit Services during the two-year period immediately preceding termination of his employment and Prospective Accounts, this geographic limitation is reasonable. Moreover, Employee acknowledges and agrees that the restrictions contained in Section 8.A do not prohibit Employee from competing with the Company or performing insurance or benefits services for potential clients throughout the entire world except for Protected Seller Accounts, Protected Company Accounts and Prospective Accounts, and that those restrictions are reasonable and narrowly tailored to further the Company's legitimate interest to protect its Confidential Information, account relationships, and goodwill, and such restrictions will not unduly burden Employee's ability to earn a living after his employment with the Company is terminated.

D. If, within two years of the termination of Employee's employment with the Company, Employee shall engage in, or join a company or business enterprise that is engaged in providing Insurance

Services and/or Benefit Services, then in such event, Employee agrees that the Company may advise any Protected Seller Account, Protected Company Account and/or Prospective Account of the existence and terms of this Agreement and furnish any and all such Protected Seller Accounts, Protected Company Accounts and Prospective Accounts with a copy of this Agreement.

E.   Employee recognizes that employees of the Company are a valuable resource of the Company. Accordingly, during Employee's employment with the Company, Employee will not, directly or indirectly, solicit, induce or recruit any employee of the Company to leave the employ of the Company. In addition, for a period of two years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not directly or indirectly, solicit, induce or recruit any employee of the Company who has been provided Confidential Information to leave the employ of the Company.

F.   For purposes of Sections 7 and 8 hereof, all references to "the Company" shall be deemed to include the Acquired Business. The terms "Protected Seller Account," "Protected Company Account," and "Prospective Account" shall include all users of Insurance Services or Benefit Services, including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries who are customers of the Company on the date Employee's employment with the Company terminates, or an insurance carrier offering a custom program for which the Company is a managing general agent, managing general underwriter, program manager or an underwriting agent, regardless of how the relationship is documented or characterized. If an account of the Company or any of its affiliates is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "account of the Company or any of its affiliates" as used herein (I) shall include products or services within any entity, division or operating unit of the Client Group where the same management group within the Client Group has the primary decision making authority with respect to contracting for services of the type rendered by the Company or any of its affiliates, and (II) shall not include products or services within any entity, division or operating unit of the Client Group where the management group within the Client Group which has the primary decision making authority with respect to contracting for services of the type rendered by the Company or any of its affiliates is not the same as any management group that falls within the preceding clause. For the purposes of the covenants set forth in Sections 7 and 8 of this Agreement, the term "Prospective Account" of the Company, means any entity (other than a then-current account of the Company but including former Company accounts) with respect to whom, at any time during the one-year period preceding the termination of Employee's employment with the Company, Employee: (I) submitted or assisted in the submission of a presentation or proposal of any kind on behalf of the Company, (II) had material contact or acquired Confidential Information as a result of or in connection with Employee's

employment with the Company, or (III) incurred travel and/or entertainment expenses which were reimbursed by the Company to Employee; but the term Prospective Account does not include an account that is a customer of Employee's new employer (for the same line of insurance business for which such customer was a Prospective Account of the Company) at the time of termination of Employee's employment with the Company.

      SECTION 9.     Assignment.

      Except as provided in Section 10 hereof, this Agreement shall not be affected by any merger or consolidation or other reorganization of the Company and this Agreement shall be assignable to and binding upon and shall inure to the benefit of the continuing entity or to any successor in interest to the Company, including without limitation, any entity to which the Company sells business, assets and/or accounts of any branch, business unit or profit center in which Employee is primarily employed.  This Agreement also shall inure to the benefit of any and all affiliate companies included in the definition of the Company as used in this Agreement.  In addition, the Company may assign this Agreement to any affiliate company of AJG, in which event: (i) such affiliate shall be the employer of Employee; and (ii) except for purposes of Section 10 hereof, all references to "the Company" and all rights of the Company shall include and inure to the benefit of such employing affiliate.

      This Agreement may not be assigned nor obligations hereunder delegated by Employee.

      SECTION 10.     Release of Certain Obligations.

      Notwithstanding anything contained herein to the contrary, the obligations of Employee contained in Section 8 shall become null and void and have no further effect immediately upon a Hostile Change in Control of AJG as defined herein.  The Company shall send written notice to Employee within 10 days of a Hostile Change in Control of AJG, notifying Employee that such event has taken place.  Failure of the Company to send such notice shall not preclude the release of Employee from the obligations contained in Section 8.  For the purposes of this Section 10, the following definitions apply:

      A.   The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control, which was not approved by, or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of AJG in office immediately prior to the Change in Control who have not died or become permanently disabled.

      B.   The term "Change in Control" of AJG means and includes each and all of the following occurrences:

        (1)  A Business Combination, unless:

           a)  the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of AJG and the affirmative vote of

the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

b)   the Continuing Directors of AJG by a two-thirds vote (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person, or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

c)   the Business Combination is solely between AJG and another corporation, 50% or more of the voting stock of which is owned by AJG and none of which is owned by the Related Person; or

d)   all of the following conditions are satisfied:

I.   The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in AJG in the Business Combination is not less than the higher of:

i)   the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of AJG's common stock, or

ii)   an amount that bears that same percentage relationship to the market price of AJG's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in i) above bears to the market price of AJG's common stock immediately prior to the commencement of the acquisition of AJG's voting stock that caused such Related Person to become a Related Person, or

iii)   an amount calculated by multiplying the earnings per share of AJG's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date as customarily computed and reported in the financial press.

Appropriate adjustments shall be made with respect to i), ii) and iii) above for recapitalizations and for stock splits, stock dividends, and like distributions; and

II.   A timely mailing shall have been made to the stockholders of AJG containing in a prominent place (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors, and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of AJG other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by AJG upon receipt of such

opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

(2)   The acquisition of outstanding shares of AJG's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

(3)   Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Company shall for any reason other than death or permanent disability during such period cease to constitute a majority thereof.

(4)   A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C.   The term "Business Combination" shall mean (i) any merger or consolidation of AJG with or into a Related Person, (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets of the Company to a Related Person, (iii) any merger or consolidation of a Related Person with or into AJG, (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Company, (v) the issuance of any securities of the Company to a Related Person, (vi) the acquisition by the Company of any securities issued by a Related Person, (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of AJG's voting securities remaining, if there is a Related Person, and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D.   The term "Related Person" shall mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of AJG, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person shall not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of AJG on November 1, 1983.  Without limitation, any shares of voting stock of AJG that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, shall be deemed beneficially owned by the Related Person.

E.   The term "Substantial Part" shall mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.   The term "<u>other consideration to be received</u>" shall include, without limitation, capital stock of AJG retained by its existing public stockholders in the event of a Business Combination in which AJG is the surviving corporation.

G.   The term "<u>Continuing Director</u>" shall mean a director who was a member of the board of directors of AJG immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "<u>Outside Director</u>" shall mean a director who is not (a) an officer or employee of AJG or any relative of an officer or employee or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

<u>SECTION 11.</u>   <u>General.</u>

A.   The captions in this Agreement are not part of its provisions, are merely for reference and have no force or effect.  If any caption is inconsistent with any provision of this Agreement, such provision shall govern.

B.   This Agreement is made in and shall be governed by and construed in accordance with the laws of the State in which Employee resides, without giving effect to conflict of law principles.  The parties agree that the chosen state has a material and significant interest in questions concerning this Agreement and performance thereunder.  The parties agree that the sole and exclusive venue of any dispute between the parties with respect to this Agreement or any matters related thereto shall be a state, trial or federal district court located within the federal judicial district in which Employee resides (the "<u>Chosen Venue</u>").  Employee agrees that is not unfair nor unreasonable for the Chosen Venue to be selected as the exclusive venue for any dispute between the parties with respect to this Agreement or any matter related thereto and Employee will not suffer undue burden by having to litigate any such disputes in the Chosen Venue.  Moreover, Employee specifically covenants not to bring suit against the Company in any venue other than the above-selected exclusive Chosen Venue with respect to any dispute between the parties relating to this Agreement.  Employee waives and agrees not to interpose any argument that the Chosen Venue is an inconvenient forum for litigation.

**C.   <u>Waiver of Jury Trial.</u>  Because of the time and expense involved in the docketing of, preparation for and participation in a jury trial, the parties desire that any dispute arising hereunder will be decided by a judge rather than a jury.  Therefore, the parties hereby knowingly, voluntarily and intentionally waive the right either may have to a trial by jury in respect to any litigation based hereon, or arising out of, under or in conjunction with Employee's employment with Company, this Agreement, or any course of conduct, course of dealing, statement (whether verbal or written) or actions of either party.**

D.   This instrument contains the entire agreement of the parties and supersedes all other prior agreements, understandings, negotiations, correspondence, undertakings and communications of the parties, whether oral or written, relating to the employment of Employee by the Company.

E.   Subject to Section 11.F below, this Agreement may not be amended, altered, modified or superceded without the prior written consent of both parties, and such instrument shall expressly acknowledge that it is an amendment or modification of this Agreement.  Waiver of any term or condition of this Agreement shall not be construed as a waiver of any subsequent breach or failure of the same term or condition, or any other term or condition.  Any waiver must be in writing. No amendment, alteration, modification or waiver may be signed by Employee on behalf of the Company, its assignees, successors or assigns.

F.   To the extent that any of the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted by a court of competent jurisdiction so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

G.   All notices, requests, demands, claims and other communications hereunder shall be given in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) four business days after being mailed to the recipient by certified or registered mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below:

| COMPANY: | Arthur J. Gallagher & Co.<br>2850 Golf Road<br>Rolling Meadows, IL 60008<br>Attn: General Counsel |
|---|---|
| EMPLOYEE: | Employee's then current residence address as shown on the Company's records. |
| With a copy to: | Cadwell, Sanford, Diebert, and Garry<br>200 East 10th<br>Sioux Falls, SD 57101<br>Attn: Steve Sanford |

or to such other addresses as the parties may hereafter designate to each other in writing.

H.   The use of the male gender in this Agreement includes the female gender.  The words "including" or "include" shall not be interpreted as terms of limitation or exclusion.

I.     This Agreement may be executed in counterparts, each of which shall be deemed an original copy.

J.     In the event that any amounts payable hereunder would subject the Employee to penalties under Code section 409A, the Company and the Employee shall cooperate diligently to amend the terms of this Agreement to avoid, insofar as possible, such penalties while minimizing any adverse impact of any such amendment upon the economic, tax or accounting implications to the Employee.

*(Remainder of the page intentionally left blank; signatures on the following page)*

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement as of the Effective Date.

ARTHUR J. GALLAGHER & CO.,
on behalf of itself and its subsidiaries, divisions and
affiliated and related companies

By: _____
/ Jerome S. Hanner, Vice President

EMPLOYEE

_____
Timothy J. Donohue

| FOR HR USE ONLY: |
| --- |
| Employee ID:_____ |

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement as of the Effective Date.

ARTHUR J. GALLAGHER & CO.,
on behalf of itself and its subsidiaries, divisions and affiliated and related companies

By: _____
        Jerome S. Hanner, Vice President

EMPLOYEE

_____
Timothy J. Donohue

┌─────────────────────────────────────┐
│ FOR HR USE ONLY:                     │
│                                      │
│ Employee ID:_____         │
└─────────────────────────────────────┘

# EXHIBIT B

## Senate Bill 92

## 2022 South Dakota Legislature

# Senate Bill 92

### AMENDMENT 92A FOR THE INTRODUCED BILL

1  **An Act to require that taxpayer funded pool arrangements providing workers'**
2      **compensation coverage demonstrate financial stability, reliable**
3      **management, and fair pricing.**

4  BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF SOUTH DAKOTA:

5  **Section 1. That § 1-24-17.1 be AMENDED:**

6      **1-24-17.1.** Each pool arrangement, as defined in § 1-24-11, shall must have an
7  annual audit of its financial statements conducted in accordance with generally accepted
8  government auditing standards. A copy of the audited financial statements shall must be
9  filed with the Department of Legislative Audit within twelve three five months of the close
10  of the previous fiscal year for the pool arrangement.

11      The department shall, within five working days, make audited financial statements
12  filed pursuant to this section available easily and readily accessible to the public on the
13  department's website.

14      The auditor-general may examine all financial records, related to funds provided
15  by the state or its political subdivisions, of any pool arrangement, if deemed necessary
16  and in the public interest by the auditor-general.

17  **Section 2. That chapter 1-24 be amended with a NEW SECTION:**

18      On or before September first of each year, each pool arrangement, as defined in §
19  1-24-11, which provides workers' compensation coverage, shall provide to the
20  Department of Legislative Audit and to each pool member:
21      (1)    A financial plan setting forth:
22          (a)    The coverages to be offered by the pool, applicable deductibles and offsets,
23              and the maximum exposure levels;

Underscores indicate new language.
Overstrikes indicate deleted language.

1          (b)    The manner of determining the rates that current and prospective pool

2                 members are to be quoted;

3          (c)    The amount of cash reserves needed, in the exercise of sound and prudent

4                 actuarial judgment, to cover liabilities and expenses for the covered actions

5                 of current and prospective pool members; and

6          (d)    The amount of aggregate excess insurance or reinsurance to prevent

7                 exhaustion of the pool's resources in a given fiscal period;

8    (2)    A management plan that describes:

9          (a)    The governance of the pool, the governing board's authority and manner of

10                selecting governing board members, and the governing board members'

11                biographical information, qualifications, terms of office, and compensation;

12          (b)    The time and manner in which pool member contributions are processed;

13          (c)    The methods by which assessments for deficiencies are determined and

14                collected;

15          (d)    The methods for identifying and disposing of surplus funds;

16          (e)    The criteria for pool membership, including admission and voluntary or

17                involuntary termination; and

18          (f)    The process for termination of the pool arrangement;

19    (3)    A copy of all organizational documents, including the bylaws;

20    (4)    A copy of any contract or other document that sets forth the rights, privileges, and

21            obligations of a pool member, including terms, coverages, limits, and deductibles;

22    (5)    A copy of any contract in effect between the pool and a third-party administrator

23            or other vendor;

24    (6)    The annual premium paid by each pool member, identified by name;

25    (7)    The claims paid by the pool on behalf of each pool member, identified by name;

26    (8)    An administrative report that provides the direct premiums written by the pool,

27            the pool's market share and cumulative market share compared to private sector

28            providers of workers' compensation insurance in this state, the direct premiums

29            earned by the pool, the direct losses incurred by the pool, and the pool's pure

30            direct loss ratio; and

31    (9)    Biographical and compensatory information for managerial level staff.

32            The department shall, within five working days, make the information provided in

33   accordance with this section easily and readily accessible to the public on the department's

34   website.

35   **Section 3. That chapter 2-6 be amended with a NEW SECTION:**

Underscores indicate new language.
Overstrikes indicate deleted language.

92A                                    3                                    663

1          The Government Operations and Audit Committee shall annually review the

2    information provided by each pool arrangement, in accordance with section 1 of this Act.

3    A representative of each pool arrangement shall appear before the committee, at the time

4    and in the manner requested by the committee, to:

5    (1)     Review the pool's overall performance;

6    (2)     Address any changes in the pool's overall performance compared to that of the

7            preceding reporting period; and

8    (3)     Provide comparative information regarding the performance of the pool and the

9            performance of the private sector providers of workers' compensation insurance in

10           this state.

Underscores indicate new language.
Overstrikes indicate deleted language.

# EXHIBIT C

## 1/25/22 Guest Register

## Senate Commerce & Energy

# GUEST REGISTER

## SENATE COMMERCE & ENERGY

DATE: 1/25/2022

**PLEASE WRITE LEGIBLY, THANK YOU.**

| NAME | REPRESENTING | CITY | BILL NO. | FOR | AGAINST | DO YOU WISH TO TESTIFY? |
|---|---|---|---|---|---|---|
| Tim Donohue | ? | Sioux Falls | SB 92 | ✓ | | Yes |
| Randy Moses | IIASD | Pierre | 92 1059 | ✓ | ⟩ | yes |
| JASON PIEPER | SB 92 | Watertown | SD 92 | ✓ | | NO |
| Holly Nagel | ASBSD | Pierre | SB 92 | | ✓ | no |
| Yvonne Taylor | SD Municipal League | T + Pierre | 92 | | X | y |
| Travis Jordan | Division Insurance | Pierre | HB1059 | ✓ | | |
| Chris Nelson | PUC | Pierre | SB 40 | ✓ | | Yes |
| Brian Walsh | DANR | Pierre | SB 40 | | X | yes |
| Deb Abraham | SDML WC Fund | Pierre | 92 | | X | yes |
| Doug Abraham | | | | | | |
| LARRY WALKER | MUNI WC LEAGUE MUNI B?, MUNI 269 STREES | Canton | 40 | ✓ | | |
| Chase Jensen | Dakota Rural Action | Brookings | 40 | ✓ | | ✓ |
| Darla Pollman Rogers | SDREA ; SDTA | Pierre | 40 | ✓ | | yes |
| Brett Koenecke | SD Electric Utilities | Pierre | 40 | ✓ | | yes |

**REGISTER**

**SENATE COMMERCE & ENERGY**

DATE: 1 - 25 - 2022

**PLEASE WRITE LEGIBLY, THANK YOU.**

| NAME | REPRESENTING | CITY | BILL NO. | FOR | AGAINST | DO YOU WISH TO TESTIFY? |
|---|---|---|---|---|---|---|
| Dan Anderson | DOS VC | | 1862 | X | | ✓ |
| Russell Olson | Auditor General | Pierre | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |